IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PEDRO SEGURA,                              :
                                           :    1:10-cv-1341
                        Petitioner,        :
                                           :    Hon. John E. Jones III
            v.                             :
                                           :    Hon. Martin C. Carlson
ERIC HOLDER, *et al.*,                     :
                                           :
                        Respondents.       :

## MEMORANDUM

### September 15, 2010

### THE BACKGROUND OF THIS MEMORANDUM IS AS FOLLOWS:

This matter is before the Court on the Report and Recommendation

("R&R") of Magistrate Judge Martin C. Carlson (Doc. 18), filed on August, 2010,

which recommends that the petition of Pedro Segura ("Petitioner" or "Segura"),

for writ of habeas corpus pursuant to 28 U.S.C. § 2241 be denied. No objections

to the R&R have been filed by any party.[1] For the reasons set forth below, the

Court will adopt the R&R.

---

[1] Objections were due by September 13, 2010.

## I.  STANDARD OF REVIEW

When, as here, no objections are made to a magistrate judge's report and recommendation, the district court is not statutorily required to review the report before accepting it. *Thomas v. Arn*, 474 U.S. 140, 149 (1985). According to the Third Circuit, however, "the better practice is to afford some level of review to dispositive legal issues raised by the report." *Henderson v. Carlson*, 812 F.2d 874, 878 (3d Cir. 1987). "[T]he court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." Fed. R. Civ. P. 72(b), advisory committee notes; *see also Henderson,* 812 F.2d at 878-79 (stating "the failure of a party to object to a magistrate's legal conclusions may result in the loss of the right to de novo review in the district court"); *Tice v. Wilson*, 425 F. Supp. 2d 676, 680 (W.D. Pa. 2006); *Cruz v. Chater,* 990 F. Supp. 375-78 (M.D. Pa. 1998); *Oldrati v. Apfel,* 33 F. Supp. 2d 397, 399 (E.D. Pa. 1998). The Court's examination of this case confirms the Magistrate Judge's determinations.

## II.  PROCEDURAL/FACTUAL BACKGROUND

This case involves a habeas corpus petition filed by an immigration detainee and violent felon, Segura. Segura is a native of Columbia who entered the United States on March 3, 1975, as a lawful permanent resident. On August 31, 2008, Segura entered a guilty plea in Montgomery County Pennsylvania Court of

Common Pleas to the offenses of Terroristic Threats, in violation of 18 Pa. C. S. §

2706(a)(1), and Possessing Instruments of Crime (Weapon), in violation of 18 Pa.

C. S. § 907(b). Segura was sentenced to 11 ½ to 23 months in prison as a result of

this conviction.[2]

On August 8, 2008, immigration officials learned of Segura's conviction and

served him with a Notice to appear, charging him with violating 8 U.S.C. §§

1227(a)(2)(A)(iii) and (a)(2)(c). Immigration officials also lodged a detainer

against Segura. On May 13, 2009, Segura completed serving his sentence, and

immigration officials took custody of him in York, Pennsylvania, to commence

removal proceedings.

Segura's removal proceedings commenced on June 1, 2009, when he made

his first appearance before an immigration judge. From this point on, Segura

engaged in a litigation strategy marked by a pattern of tactical delays, including

requesting multiple continuances to obtain counsel, which were granted. Finally,

on July 27, 2009, Segura appeared and admitted the allegations contained in the

Notice to Appear. The immigration judge found that Segura was not entitled to any

---

[2] The incident which led to these charges and conviction stemmed out of an ugly episode of domestic violence between Segura and his girlfriend in December 2007. During that incident, Segura struck his girlfriend in the back of the head with a handgun and then held the gun to her head while he threatened to kill her. Segura then beat his girlfriend repeatedly about the head and dragged her by her hair through her apartment. (See R&R, p. 2).

form of relief based on his aggravated felony conviction and entered a formal order of removal. Thus, within two months of his first appearance before the immigration judge, and despite his multiple continuance requests, a removal order was entered against Segura.

Segura appealed the immigration judge's decision, which was affirmed by the Board of Immigration Appeals ("BIA") on November 12, 2009. On November 13, 2009, immigration officials requested travel documents from the Colombian Consulate to secure Segura's deportation. The documents were received from the Colombian Consulate on December 8, 2009.

While these efforts were on-going, on December 4, 2009, Segura sought to delay his deportation by filing a Petition for Review with the Third Circuit Court of Appeals. On December 17, 2009, the Third Circuit temporarily stayed Segura's deportation while it considered his petition. Thereafter, on February 16, 2010, the Third Circuit vacated Segura's stay of deportation. New travel documents were obtained from the Colombian Consulate for Segura since the previous documents had expired.

On March 29, 2010, immigration officials made arrangements to return Segura to Colombia, however, while he was en route, immigration officials were informed that the U.S. Department of Justice Office of Immigration Litigation

sought to have Segura's case remanded to the BIA . Accordingly, on April 5, 2010, Segura returned to immigration custody. On June 4, 2010, the Third Circuit remanded the case to the BIA. On July 12, 2010, the United States requested that the BIA order an expedited remand of Segura's case to the immigration judge for further fact-finding.

Thus, as a result of these proceedings initiated by the Government to ensure that Segura's rights were fully protected, the order of removal previously entered in this case has been re-opened, and Segura remains, for the time being, in pre-removal detention as the United States expedites this further review of his case. Despite this, Segura filed a petition for writ of habeas corpus challenging his pre-removal custody.

## III.   DISCUSSION

Magistrate Judge Carlson correctly concludes that Segura's pre-removal detention, which is mandated by statute, is constitutionally permissible and does not offend due process. *See Demore v. Kim*, 538 U.S. 510 (2003)(Detention during removal proceedings is a constitutionally permissible part of that process). Immigration proceedings in this case began in June 2009, approximately fourteen months ago. Desipte initial delays caused by Segura, a removal order was entered by the end of July, within two months. Following the entry of that order, Segura

pursued appeals to the BIA and the federal courts, appeals that delayed

implementation of the order for an additional six months, from August 2009

through February 2010. Once the appeals were exhausted, the immigration

officials promptly attempted to remove Segura but were halted in the process, out

of an abundance of caution to Segura's rights, to allow the BIA to re-examine its

removal decision. The Government has sought to expedite this review and once

the expedited review is completed, if the removal order still stands, the

Government is prepared to act swiftly in removing Segura.[3]

Furthermore, in the event a final order of removal is re-entered against

Segura, he will have further constitutional protections against any undue delay and

detention. For aliens awaiting removal, the contours of those rights are not defined

by the United States Supreme Court's decision in *Zadvydas v. Davis*, 533 U.S. 687

(2001).

As we have already mentioned, neither Respondents nor the Petitioner have

filed objections to this R&R. Because we agree with the sound reasoning that led

the Magistrate Judge to the conclusions in the R&R, we will adopt the R&R in its

---

[3] While we are fully cognizant of our decision in *Alli v. Decker*, 644 F. Supp. 2d 535 (M.D. Pa. 2009), we agree with Magistrate Judge Carlson's qualitative analysis here and recognize that the reasonableness of pre-removal order detention is not a rote mathematical calculation.

entirety. With a mind towards conserving judicial resources, we will not rehash the

reasoning of the Magistrate Judge; rather, we will attach a copy of the R&R to this

document, as it accurately reflects our consideration and resolution of the case *sub*

*judice*. An appropriate Order shall issue.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PEDRO SEGURA,** | : | **CIVIL NO. 1:10-CV-1341** |
| | : | |
| **Petitioner,** | : | **(Judge Jones)** |
| | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **ERIC HOLDER, et al.,** | : | |
| | : | |
| **Respondents.** | : | |

## REPORT AND RECOMMENDATION

### I.   Statement of Facts and of the Case

#### A.   Pedro Segura's Criminal History

This case involves a habeas corpus petition filed by an immigration detainee and violent felon, Pedro Segura. Segura is a native of Colombia who entered the United States on March 3, 1975, as a lawful permanent resident. (Doc. 14-1 at ¶¶ 1, 2.) On August 1, 2008, Segura entered a guilty plea in the Montgomery County Pennsylvania Court of Common Pleas to the offenses of Terroristic Threats, in violation of 18 Pa.C.S. § 2706 (a)(1), and Possessing Instruments of Crime (weapon), in Violation of 18 Pa.C.S. § 907(b). ( Doc. 14-1, at ¶ 2; Doc. 14-2.) Segura was sentenced to 11 ½ to 23 months in prison as a result of this conviction. (Id.)

The incident which led to these charges and conviction stemmed out of an ugly episode of domestic violence. In December 2007, Segura struck a girlfriend in the back of the head with a handgun and held the gun to her head while he threatened to kill her.(Id.) Segura then beat his girlfriend repeatedly about the head and dragged her by her hair through her apartment. (Id.) In the course of this domestic violence Segura's victim alleged that over the span of several days, Segura, "hit her in the face, threw her on the ground, kicked/stomped on her chest/rib area, and dragged her by her hair." (Id.) When the victim of this assault finally went to the police, she bore mute evidence of this violence in the form of "visible bruises on her jaw, right cheek area, left bicep/tricep area, scratches, on left forearm, cut on left index finger, and bruises/marks in her left chest/rib and back area." (Id.) The police took Segura into custody and found at the apartment that he shared with the victim a "9mm Lugar ... fully loaded with a round in the chamber." (Id.)

On August 8, 2008, immigration officials learned of Segura's conviction for this violent assaultive conduct, and served Segura in jail with a Notice to Appear ("NTA"), charging him with violating 8 U.S.C.§§ 1227 (a)(2)(A)(iii) and (a)(2)(c).(Doc. 14-3, Notice to Appear.) Immigration officials also lodged a detainer against Segura with state prison officials.(Doc. 14-1 at ¶ 2.) On May 13, 2009, Segura completed serving his state criminal sentence, and immigration officials took custody of him in York, Pennsylvania to commence removal proceedings.

## B.    The History of Segura's Removal Proceedings

Segura's removal proceedings commenced on June 1, 2009, when the Petitioner made his first appearance before an immigration judge. From the outset of these proceedings, Segura engaged in a litigation strategy marked by a pattern of tactical delays. Thus, at his initial appearance on June 1, Segura requested a continuance of the proceeding to hire counsel. (Doc. 14-4, at ¶ 2.)  This request was granted and a second removal hearing was scheduled for June 29, 2009.

On June 29, 2009, during his second appearance before an immigration judge, Segura once again requested a continuance of removal proceedings so he could retain counsel.(Id.) This request was also granted , and these proceedings were continued to July 27, 2009. (Id.) Thus, the first two months of delay, and detention, in this matter were wholly attributable to Segura, who specifically requested these delays.

On July 27, 2009, Segura made his third appearance before the immigration judge. On this occasion Segura appeared, without counsel, and elected to admit to the allegations in the Notice to Appear.(Id.) Given these admissions by Segura, the immigration judge found that the Petitioner was not eligible for any form of relief based on his aggravated felony conviction and entered an order of removal. (Doc. 14-2, at ¶ 2.) Thus, within two months of his first appearance before the immigration judge, and despite two requests for delays by Segura in these proceedings, a removal order was entered against Segura in this matter.

3

While Segura admitted to the allegations in the Notice to Appear at this July 27, 2009 removal hearing, he also reserved the right to appeal the immigration judge's findings. (Id.) On August 17, 2009, Segura exercised this right and the Department of Homeland Security ("DHS") received a Board of Immigration Appeals ("BIA") notice of Segura's intent to appeal the immigration judge's decision. (Id.) In connection with this appeal filed by Segura, the Petitioner then indulged in a further series of tactical litigation delays. Thus, at the outset of these proceedings, Segura requested an extension of time to file his appeal brief. On September 14, 2009, the BIA granted Segura's requested extension of time. ( Id.)

Despite these delays requested by Segura, immigration officials were able to resolve this BIA appeal with dispatch. Thus, on November 12, 2009, the BIA affirmed the immigration judge's decision, once again clearing the way for Segura's removal from the United States. (Id.) The following day, on November 13, 2009, immigration officials requested travel documents from the Colombian Consulate to secure Segura's deportation.(Id.) On December 8, 2009, immigration officials received these travel documents from the Colombian Consulate. (Id.)

While these efforts were on-going, on December 4, 2009, Segura sought to further delay this deportation by filing a Petition for Review with the Third Circuit Court of Appeals. (Id.) In conjunction with this petition for review, Segura also requested that the court of appeals stay of his deportation. On December 17, 2009, the

4

United States Court of Appeals for the Third Circuit granted Segura a temporary stay as it considered this petition. (Id.)

Two months later, on February 16, 2010, the Court of Appeals vacated Segura's stay of deportation, once again paving the way for his removal from the United States. (Id.) Because Segura's travel documents by this time had expired, immigration officials secured new travel documents for Segura from the Colombian Consulate on March 4, 2010.( Id.) On March 29, 2010, immigration agents made arrangements to return Segura to his homeland, and actually placed Segura on a removal flight to Colombia. However, while Segura was en route,[1] immigration officials were informed that the U.S. Department of Justice Office of Immigration Litigation ("OIL") sought to have Segura's case remanded to the BIA. (Doc. 14-5, Respondent's Motion to Remand, filed March 31, 2010.).[2] Accordingly, on April 5, 2010, Segura returned to

---

[1] Indeed, while it does not control our disposition of this matter, we note that Segura alleges that he had actually been transported to Colombia, but not released from immigration custody, at the time that immigration officials received notice that his case was being remanded, and returned him to the United states. (Doc. 17.)

[2] In canceling Segura's removal immigration officials and the Department of Justice appear to have shown a solicitous concern for the rights of the Petitioner. This remand request was invited by the Government in order to allow the BIA to re-examine its initial decision in this case, a decision in which the BIA relied on the alien's admissions, and on the Third Circuit's decision in Bovkun v. Ashcroft, 283 F.3d 166 (3d Cir. 2002), holding that a predecessor version of the statute was a crime of violence. Bovkun, however, was modified or superseded by a statutory amendment to the state criminal statute, as the Fifth Circuit noted in United States v. Martinez-Paramo, 380 F.3d 799 (5th Cir. 2004). The amended version of the state criminal statute is divisible, containing only one section that is defined as a

immigration custody.(Doc. 14-1, p. 2.) On June 4, 2010, the United States Court of Appeals for the Third Circuit remanded the case to the BIA. See Order Granting Respondent's Motion to Remand. (Doc. 14-7.) On July 12, 2010, the United States requested that BIA order an expedited remand of Segura's case to the immigration judge for further fact finding. (Doc. 14-5.)

Thus, as a result of these proceedings initiated by the Government to ensure that Segura's rights are fully protected, the order of removal previously entered in this case has been re-opened, and Segura remains for the time being in pre-removal detention as the United States expedites this further review of his case.

C.    Segura's Habeas Petition

Displeased by the fact of this continuing detention, a detention which was largely caused until recently by his own litigation tactics, Segura filed this *pro se* petition for a writ of habeas corpus on June 28, 2010. (Doc. 1.) This petition broadly challenges on statutory and constitutional grounds the ability of immigration officials to continue to hold Segura while he completes the litigation of this removal case. The

---

crime of violence. OIL sought remand so the Board could further consider whether Petitioner's conviction under the amended version of Title 18 § 2706 of the Pennsylvania Penal Code constitutes an aggravated felony. Although Segura's weapons conviction would not disqualify him from applying for cancellation of removal, his conviction for terroristic threats as an aggravated felony bars his eligibility for cancellation as a matter of law. Depending on the outcome of the aggravated felony determination by the BIA, Segura may be able to apply for asylum or cancellation of removal.

Government has filed a response to this petition. (Doc.14) Segura, in turn, has filed a document, in the nature of a traverse, which he calls a motion addressing the Respondent's memorandum of law. (Doc. 17.) Therefore, this matter is now ripe for resolution.

Segura's detention prior to the entry of a final removal order is governed by a series of statutory and constitutional standards. However, in this case, the application of these statutory and constitutional benchmarks to Segura's case leads to the a single result. Because the period of detention experienced by Segura during his removal proceedings is required by statute and does not offend constitutional due process principles, we recommend that the Court deny Segura's petition at this time without prejudice to renewal of this claim, if warranted, at an appropriate future time.

## II.    Discussion

### A.    Introduction

In this petition, Pedro Segura, a Colombian national, and a convicted violent felon, seeks to challenge his detention by immigration officials as excessive and unreasonable. While the precise tenor of this complaint is not entirely clear, it appears that the Petitioner believes that this case involves excessive pre-removal detention under the mandatory detention provisions of 8 U.S.C. § 1226(c)(1)(B); and that his continued detention offends constitutional due process considerations.

In addressing this concern, we must determine whether Segura's detention is permitted by law, and further assess whether the duration of this detention pending the entry of a final removal order offends constitutional due process considerations.

In this case, for the reasons set forth below, we find that Segura's detention is both mandated by statute, and constitutionally permitted. Therefore, we recommend that this petition for writ of habeas corpus be denied.

### B.    Segura's Detention Pending Entry of A Removal Order Was Compelled By Statute and Does Not Violate Due Process

At the outset, we will examine the period of pre-removal detention experienced by Segura, carefully scrutinizing that period of detention to ensure both that it was legally appropriate, and that it was not so excessive as to violate Segura's due process rights.

In assessing this initial detention period, we begin by noting that, to the extent that Segura complains about the duration of this pre-removal detention period, this detention appears to be compelled by statute. Section 1226 of Title, 8, United States Code, directs the Attorney General to detain certain criminal aliens like Segura pending removal, stating in clear and precise terms as follows:

> ( c ) Detention of Criminal Aliens--(1) Custody.--The Attorney General shall take into custody any alien who.--(B) is deportable by reason of having committed any offense covered in section 237(a)(2)(A)(ii), (A)(iii), (B), (C), or (D).

8

8 U.S.C. § 1226(c)(1)(B)(emphasis added).

By enacting this mandatory detention requirement for a sub-class of criminal

aliens awaiting removal from the United States, Congress was responding to specific,

immigration concerns caused by the failure to timely deport aliens who had used the

liberties conferred by this nation as a license to commit crimes. As the Supreme Court

has noted:

> Congress adopted this provision against a backdrop of wholesale failure
> by the INS to deal with increasing rates of criminal activity by aliens.
> See, *e.g.*, Criminal Aliens in the United States: Hearings before the
> Permanent Subcommittee on Investigations of the Senate Committee on
> Governmental Affairs, 103d Cong., 1st Sess. (1993); S.Rep. No. 104-48,
> p. 1 (1995) (hereinafter S. Rep. 104-48) (confinement of criminal aliens
> alone cost $724 million in 1990). Criminal aliens were the fastest
> growing segment of the federal prison population, already constituting
> roughly 25% of all federal prisoners, and they formed a rapidly rising
> share of state prison populations as well. Id., at 6-9. Congress'
> investigations showed, however, that the INS could not even *identify*
> most deportable aliens, much less locate them and remove them from the
> country. Id., at 1. One study showed that, at the then-current rate of
> deportation, it would take 23 years to remove every criminal alien
> already subject to deportation. Id., at 5. Making matters worse, criminal
> aliens who were deported swiftly reentered the country illegally in great
> numbers. Id., at 3.The INS' near-total inability to remove deportable
> criminal aliens imposed more than a monetary cost on the Nation. First,
> as Congress explained, "[a]liens who enter or remain in the United States
> in violation of our law are effectively taking immigration opportunities
> that might otherwise be extended to others." S.Rep. No. 104-249, p. 7
> (1996). Second, deportable criminal aliens who remained in the United
> States often committed more crimes before being removed.

<u>Demore v. Kim</u>, 538 U.S. 510, 518 (2003).

Recognizing these concerns, Congress mandated the detention of all criminal aliens, like Segura, who are convicted of violent felonies pending completion of removal hearings. In this case, it appears that Segura falls within the narrow class of criminal aliens who are subject to the mandatory detention provisions of 8 U.S.C. § 1226(c)(1)(B). Therefore, by statute, he is subject to mandatory detention pending the entry of a removal order in these proceedings. See Bovkun v. Ashcroft, 283 F.3d 166 (3d Cir. 2002), (Pennsylvania terroristic threats conviction constitutes an aggravated felony and crime of violence for immigration purposes); Rodrigques v. Holder, No. 09-1764, 2010 WL 830929, *3 (M.D. Pa. March 4, 2010)(alien convicted of drug offenses subject to mandatory detention.)

Having determined as a matter of statutory construction that Segura is subject to this mandatory detention, we further conclude that Segura cannot sustain a constitutional due process challenge to this mandatory detention on the facts of this case. At the outset, to the extent that Segura seeks to challenge the mere fact of his detention on due process grounds, that avenue of attack is now foreclosed by the United States Supreme Court's decision in Demore v. Kim, 538 U.S. 510 (2003). In Demore, the Court addressed the issue of whether §1226 (c)(1)(B)'s mandatory detention provision violates due process. In terms that are equally applicable here, the Court held that Congress acted within its broad authority to regulate immigration

10

matters when it imposed mandatory detention on this narrow group of criminal aliens

facing removal from the United States. As the Court observed:

> In the exercise of its broad power over naturalization and immigration,
> Congress regularly makes rules that would be unacceptable if applied to
> citizens." Mathews v. Diaz, 426 U.S. 67, 79-80, 96 S.Ct. 1883, 48
> L.Ed.2d 478 (1976) . . . . And, since Mathews, this Court has firmly and
> repeatedly endorsed the proposition that Congress may make rules as to
> aliens that would be unacceptable if applied to citizens. See, e.g.,
> Zadvydas, 533 U.S., at 718, 121 S.Ct. 2491 (KENNEDY, J., dissenting)
> ("The liberty rights of the aliens before us here are subject to limitations
> and conditions not applicable to citizens"); Reno v. Flores, 507 U.S. 292,
> 305-306, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993) ("Thus, 'in the exercise
> of its broad power over immigration and naturalization, "Congress
> regularly makes rules that would be unacceptable if applied to citizens"
> ' ") (quoting Fiallo v. Bell, 430 U.S. 787, 792, 97 S.Ct. 1473, 52 L.Ed.2d
> 50 (1977), in turn quoting Mathews, supra, at 79-80, 96 S.Ct. 1883));
> United States v. Verdugo-Urquidez, 494 U.S. 259 (1990).

Demore, 538 U.S. at 521-522.

Acknowledging the authority of Congress in this field, the Court then held that:

"Detention during removal proceedings is a constitutionally permissible part of that

process." Demore, 538 U.S. at 531 (citations omitted). Yet, while reaching the

conclusion that mandatory detention of certain criminal aliens did not violate due

process, the Court emphasized the very brief duration of most removal proceedings

which rarely exceeded five months, id. at 530, and noted that the six-month delay

experienced by the alien in that case was a product of his own actions which delayed

the entry of a final removal order. Id. at 531, n. 15. Given the fixed and finite term of any pre-removal detention, the Court held that the fact of this mandatory detention did not violate due process.

Following Demore courts have frequently rebuffed efforts by criminal aliens to broadly challenge their detention pending removal. See, e.g.,Tavares v. Attorney General, 211 F. App'x 127 (3d Cir. 2007); Slebo v. District Director, No. 09-1335, 2009 WL 2151347 (M.D. Pa. July 17, 2009)(Munley, J.); Rodney v. Mukasey, No. 08-1386, 2009 WL 427171 (M.D. Pa. Feb. 20, 2009)(Muir, J.); Wright v. Bureau of Immigration and Customs Enforcement, No. 06-2278, 2007 WL 86263(M.D. Pa. Jan. 9, 2007)(Conner, J.). Yet these decisions rejecting broad due process challenges to pre-removal detention of criminal aliens do not wholly resolve the legal issues presented by this petition. In our view, consideration of the holding in Demore constitutes only the first part of our responsibility and analysis when reviewing claims like those presented by Segura.

Demore holds that mandatory detention of certain criminal aliens pending removal proceedings does not, by itself, offend due process. However, the Demore Court based this ruling upon its understanding of the short, fixed and finite term of any detention prior to removal. Thus, while Demore addressed the due process issues that arise from the mere fact that, for certain criminal aliens, detention pending removal is

12

mandatory, courts still have an independent responsibility to assess whether the duration of any mandatory detention is so extended and unreasonable as to violate due process. See, e.g., Tijani v. Willis, 430 F.3d 1241 (9th Cir. 2005); Ly v. Hanson, 351 F.3d 263 (6th Cir. 2004);Prince v. Mukasey, 593 F. Supp.2d 727 (M.D. Pa. 2008); Alli v. Decker, No. 09-698, 2009 WL 2430882 (M.D. Pa. Aug. 10, 2009); Occelin v. District Director, No. 09-164, 2009 WL 1743742 (M.D. Pa. June 17, 2009).

While the contours of this constitutional protection against excessive detention pending removal hearings are still developing, several key benchmarks have emerged. First, in assessing these claims, we must look to the duration of the detention. Thus, in general, periods of detention which significantly exceed one year may trigger constitutional concerns, see, e.g., Tijani v. Willis, 430 F.3d 1241 (9th Cir. 2005)(2 years 8 months); Ly v. Hanson, 351 F.3d 263 (6th Cir. 2004)(500 days); Prince v. Mukasey, 593 F. Supp.2d 727 (M.D. Pa. 2008)(16 months); Alli v. Decker, No. 09-698, 2009 WL 2430882 (M.D. Pa. Aug. 10, 2009)(9 and 20 months); Occelin v. District Director, No. 09-164, 2009 WL 1743742 (M.D. Pa. June 17, 2009)(2 years), while pre-removal detentions spanning a shorter period of months  present less substantial constitutional issues. See e.g.,  Demore, 538 U.S. at 531(6 months); Rodrigques v. Holder, No. 09-1764, 2010 WL 830929, *3 (M.D. Pa. March 4, 2010)(one year detention); Slebo v. District Director, No. 09-1335, 2009 WL 2151347

13

(M.D. Pa. July 17, 2009)(Munley, J.)(8 months); <u>Rodney v. Mukasey</u>, No. 08-1386, 2009 WL 427171 (M.D. Pa. Feb. 20, 2009)(Muir, J.)(18 months); <u>Wright v. Bureau of Immigration and Customs Enforcement</u>, No. 06-2278, 2007 WL 86263 (M.D. Pa. Jan. 9, 2007)(Conner, J.)(7 months).

However, the analysis here does not involve simple arithmetic. A qualitative assessment must also be made of the reasons for the delay in removal, and who bears responsibility for that delay. Therefore, when weighing claims of excessive delay made by immigration detainees challenging mandatory pre-removal detention, courts must also carefully assess the reasons for the delay. Where the delay is attributable to actions taken by the alien in the course of litigating the removal proceedings, courts typically will not hold the government accountable for that delay when conducting a due process analysis. <u>See, e.g.</u>, <u>Demore</u>, 538 U.S. at 531, n.15; <u>Castellanos v. Holder</u>, No. 08-4665, 2009 WL 2138408, at 5 (3d Cir. 2009); <u>Rodrigques v. Holder</u>, No. 09-1764, 2010 WL 830929, *3 (M.D. Pa. March 4, 2010)(one year detention held attributable to alien's litigation tactics); <u>Prince v. Mukasey</u>, 593 F. Supp. 2d 727 (M.D. Pa. 2008).

Finally, any consideration of an excessive delay claim brought by a criminal alien who is pending removal from the United States should take into account the fact that, upon entry of a final removal order, different statutory and due process

14

protections come into play, protections designed to ensure that aliens who have been ordered removed are not held in custody for an unreasonable period of time. Thus, once a final order of removal is entered, the due process protections afforded to aliens by Zadvydas v. Davis, 533 U.S. 678 (2001) apply. See Matthias v. Hogan, No. 07-1987, 2008 WL 913522 (M.D. Pa. March 31, 2008). Under Zadvydas aliens subject to such final removal orders typically must either be removed, or be given bail consideration, within six months. The availability of this relief from excessive detention following the entry of a final removal order, coupled with what is frequently the brief duration of removal proceedings, greatly reduces any due process concerns resulting from the duration of the mandatory detention of aliens pending the completion of removal proceedings. Therefore, where, as here, the entry of a final order of removal may be imminent, these concerns about delay and extended detention are greatly reduced.

In this case, our review of these fundamental due process considerations leads us to conclude that the pre-removal delay experienced by Segura presently does not offend due process. Immigration proceedings in this case began in June, 2009, approximately fourteen months ago. Despite initial delays caused by Segura, a removal order was entered by the end of July 2009, within two months. Following the entry of that order, Segura pursued appeals to the BIA and the federal courts, appeals that

delayed implementation of this order for an additional six months, from August 2009 through February 2010. Once these appeals were exhausted, immigration officials again moved promptly, arranging Segura's removal by the end of March, 2010. Immigration officials then halted this process, out of an abundance of caution, to protect Segura's rights and to allow the BIA to re-examine its removal decision in light of some changing case law, a process that the Government has committed to expedite. Once this expedited review is completed, the Government stands ready to act swiftly, should the removal order in this case still stand. Thus, in its current posture, Segura's case is one which illustrates the Government's commitment to act promptly, but fairly. Moreover, in Segura's case, at least 8 months of the delays in this litigation and detention are attributable to Segura's own litigation choices, choices which should not be held against the Government when assessing this delay. See, e.g., Demore, 538 U.S. at 531, n.15; Castellanos v. Holder, No. 08-4665, 2009 WL 2138408, at 5 (3d Cir. 2009); Rodrigques v. Holder, No. 09-1764, 2010 WL 830929, *3 (M.D. Pa. March 4, 2010)(one year detention held attributable to alien's litigation tactics); Prince v. Mukasey, 593 F. Supp. 2d 727 (M.D. Pa. 2008).

Finally, to the extent that Segura has been delayed and detained since April, 2010 at the Government's request, that request was motivated by a desire to fully protect Segura's rights and allow the immigration court to re-examine his case in light

of developing case law. As the Government has noted, this remand request was made by the Government in order to allow the BIA to re-examine its initial decision in this case, a decision in which the BIA relied on the alien's admissions, and on the Third Circuit's decision in <u>Bovkun v. Ashcroft</u>, 283 F.3d 166 (3d Cir. 2002), holding that a prior version of Pennsylvania's terroristic threats statute was a crime of violence. However, the Pennsylvania terroristic threats statute considered in <u>Bovkun</u> was subsequently amended .<u>See</u> <u>United States v. Martinez-Paramo</u>, 380 F.3d 799 (5th Cir. 2004). Since the amended version of the state criminal statute is divisible, and contains only one section that is defined as a crime of violence, OIL sought remand so the Board could further consider whether Segura's conviction under the amended version of this statute constituted an aggravated felony.

For his part, Segura suggests that the Government's April 2010 decision to delay this removal and allow him one last opportunity to demonstrate his right to remain constitutes an "abuse of power and manipulation of the law", (Doc. 17, p. 4), which warrants the release of the petitioner. This argument is unpersuasive. The simple facts appear to be that, in April, 2010, as Segura was being transported to Colombia, the Government identified a potential legal flaw in his removal order. This latent legal issue appears to have presented the Government with an ethical dilemma. The Government could have chosen an expedient course, and allowed the removal of

17

Segura to proceed, despite its questions concerning the adequacy of the removal order and process. This path, while convenient, would have been less than candid and would have done violence to Segura's oft-expressed desire to remain in the United States. Instead, the Government, correctly, chose a principled and candid course, disclosing its concerns to the Court, and seeking a remand of this issue. While the price of that candor has been a four-month delay in these removal proceedings, we do not believe that this delay which was inspired by the Government's desire to ensure the lawfulness of Segura's removal reflects "abuse of power and manipulation of the law," as Segura claims. (Doc. 17, p. 4.) Rather, this course of action appear to illustrate a conscientious commitment to adherence to the rule of law. Therefore, the current four-month delay resulting from this decision does not, at present, raise concerns of a constitutional dimension warranting habeas relief.

Thus, an assessment of the factors which govern our due process analysis of Segura's pre-removal detention militates heavily against the Petitioner. At the outset, on the unique facts of this case the duration of this detention pending removal, standing alone, does not raise grave concerns. While approximately fourteen months elapsed since the commencement of these removal proceedings, and Segura's initial immigration detention, much of this period–at least 8 months– has involved delays instigated by Segura. Further, the continued duration of this detention appears both

18

fixed and finite, and simply entails brief detention during an expedited remand of this case to the immigration courts, for a review of the removal order in light of developing case law. Thus, this removal order either will be promptly vacated or will become administratively final once this expedited review on remand is completed. Therefore, in terms of the nature and duration of this detention which is attributable to the Government, this case falls within that range of cases where detention for a period of months has been deemed permissible. See, e.g., Demore, 538 U.S. at 531(6 months); Rodrigques v. Holder, No. 09-1764, 2010 WL 830929, *3 (M.D. Pa. March 4, 2010)(1 year); Slebo v. District Director, No. 09-1335, 2009 WL 2151347 (M.D. Pa. July 17, 2009)(Munley, J.)(8 months);Rodney v. Mukasey, No. 08-1386, 2009 WL 427171 (M.D. Pa. Feb. 20, 2009)(Muir, J.)(18 months).

Furthermore, the pre-removal detention in this case is largely attributable to litigation decisions made by Segura, who was almost exclusively responsible for the first 8 months of delay in the litigation of this matter. Despite these delays, the Government acted with dispatch, requesting expedited proceedings, securing travel documents and otherwise endeavoring to ensure a prompt resolution of this matter.

Nor can the Government be faulted for its decision to briefly delay Segura's removal by requesting a remand of this case in April 2010. That decision appears to have been made out of an abundance of caution to permit immigration courts to re-

19

examine their prior ruling in light of developing case law, and was designed to ensure that Segura's legal rights were fully protected before he was removed from the United States. In sum, this is a case where much of the delay and detention was a product of choices made by the Petitioner, rather than inaction by the Government; where that delay is now drawing to a close; and where the current delay is intended to protect Segura's rights and give both Segura and the immigration courts one final opportunity to re-examine whether removal is proper here. In such instances, where delays are not wholly attributable to government inaction, the courts generally decline to consider due process claims by detained criminal aliens. See, e.g., Demore, 538 U.S. at 531, n.15; Rodrigques v. Holder, No. 09-1764, 2010 WL 830929, *3 (M.D. Pa. March 4, 2010) Castellanos v. Holder, No. 08-4665, 2009 WL 2138408, at 5 (3d Cir. 2009); Prince v. Mukasey, 593 F. Supp. 2d 727 (M.D. Pa. 2008).

Finally, this is a case in which the period of detention pending the entry of a removal order appears to have a fixed and finite duration, and only awaits the resolution of this expedited remand. The resolution of that remand, therefore, should not unduly delay removal and should conclude this action. If the decision on remand favors Segura, his custody and these removal proceedings may very well end. If the remand does not favor Segura, then his removal order will quickly become final, and

he can be promptly removed. In either event Segura's right to avoid further, excessive detention pending entry of a removal order will be fully vindicated.

Furthermore, in the event that Segura becomes subject to an administratively final order of removal, his detention will be governed by a different, more rigorous, set of statutory and constitutional rules, rules designed to avoid undue delay. First, by statute, once an alien like Segura is subject to a final removal order, he may be detained under 8 U.S.C. § 1231(a), which directs the Attorney General to remove such aliens within 90 days of the entry of a removal order. 8 U.S.C. § 1231(a)(1)(A). The statute then commands that "[d]uring the removal period the Attorney General shall detain the alien", 8 U.S.C. § 1231(a)(2), and with respect to criminal aliens like Segura provides that: "Under no circumstance during the removal period shall the Attorney General release an alien who has been found ...deportable under section 1227(a)(2) ... of this title." 8 U.S.C. § 1231(a)(2). For purposes of our analysis of any post-final order period of detention, this statutory ninety-day "removal period" during which detention is mandatory begins on the date the order of removal becomes administratively. See 8 U.S.C. § 1231(a)(1)(B)(I).

Upon the entry of this final order, Segura will also have further constitutional protections against undue delay and detention. For aliens awaiting removal, the contours of those rights are now defined by the United States Supreme Court's

decision in Zadvydas v. Davis, 533 U.S. 678 (2001). In Zadvydas, the United States Supreme Court extended due process protections to aliens awaiting removal from the United States, while generally sustaining the validity of the initial mandatory detention period for such aliens during the ninety-day removal period prescribed by 8 U.S.C. § 1231(a)(1)(A). Beyond this initial 90-day period the Court concluded that: "we think it practically necessary to recognize some presumptively reasonable period of detention." Id. at 701.

The Court then observed that:

> While an argument can be made for confining any presumption to 90 days, we doubt that when Congress shortened the removal period to 90 days in 1996 it believed that all reasonably foreseeable removals could be accomplished in that time. We do have reason to believe, however, that Congress previously doubted the constitutionality of detention for more than six months . . . . Consequently, for the sake of uniform administration in the federal courts, we recognize that period. After this 6-month period, once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing. And for detention to remain reasonable, as the period of prior postremoval confinement grows, what counts as the "reasonably foreseeable future" conversely would have to shrink. This 6-month presumption, of course, does not mean that every alien not removed must be released after six months. To the contrary, an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future.

Id. at 701.

Taken together, 8 U.S.C. § 1231(a)(1)(A) and Zadvydas create a statutory and constitutional framework for protecting the rights of aliens who are detained pursuant to administratively final removal orders. Under this framework, such aliens shall be detained for the first 90 days of the removal period and further detention beyond this 90-day period will be presumed reasonable up to a period of 6 months, at which time aliens subject to final removal orders must either be removed, or be given bail consideration.

Thus, in the instant case, Segura's pre-removal detention is mandated by statute, and is constitutionally permissible. Moreover, that pre-removal detention will likely soon draw to a close given the current posture of these immigration proceedings, at which time, if the removal order is affirmed, Segura will be entitled to the protection of different statutory and constitutional safeguards designed to ensure his timely removal from the United States.

Accordingly, on these facts we find that Segura simply has not, at present, made a valid claim that he has been subjected to an unconstitutionally excessive period of pre-removal delay. Therefore, this petition should be denied without prejudice to future requests when, and if, Segura's continued detention becomes sufficiently prolonged to trigger constitutional concerns.

23

## III.    **Recommendation**

For the foregoing reasons, upon consideration of this Petition for Writ of Habeas Corpus, IT IS RECOMMENDED that the Petition (Doc. 1) and motion in opposition to Respondents' memorandum of law (Doc. 17) be DENIED without prejudice to renewal at such time, if any, as the delay and detention become unreasonable and excessive . The Parties are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified  proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 23d day of August, 2010.


*S/Martin C. Carlson*
**United States Magistrate Judge**

24